**UNITED STATES of America,**
**Appellee,**

v.

**Leonard RUSSO and David Wenger,**
**Defendants-Appellants.**

**Nos. 348–349, Dockets 35255, 35389.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1970.

Decided April 8, 1971.

See also D.C., 320 F.Supp. 1269.

Gilbert S. Rosenthal, New York City, for defendant-appellant Leonard Russo.

Irving Anolik, New York City, for defendant-appellant David Wenger.

Thomas J. Fitzpatrick, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City and Maurice McDermott, Asst. U. S. Atty., on the brief), for appellee.

Before MOORE, KAUFMAN and HAYS, Circuit Judges.

MOORE, Circuit Judge:

Defendants Leonard Russo (Russo) and David Wenger (Wenger) were convicted for violating 18 U.S.C. §§ 371 and 1954 in that Russo conspired with various persons to pay illegal kickbacks to Wenger, an agent and counsel of the Central States Southeast and Southwest Area Pension Fund of the International Brotherhood of Teamsters (the Fund),[1] which violation was charged in Count One of the indictment in this case. Wenger was also convicted on a second count, for receiving $5,000 with intent to be influenced in respect to his official

---

1. 18 U.S.C. § 371 provides in part:
"If two or more persons conspire * * * to commit any offense against the United States * * * and one or more such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."
18 U.S.C. § 1954 provides in part:
"(a) Whoever being—
\* \* \* \* \*
(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or
\* \* \* \* \*

receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of the actions, decisions, or other duties relating to any question or matter concerning such plan or any person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money, or thing of value prohibited by this section, shall be fined not more than $10,000 or imprisoned not more than three years, or both: * * *"

duties with respect to the Fund, also in violation of 18 U.S.C. § 1954. Wenger was sentenced on June 5, 1970 to two years, three months in prison and a $5,000 fine on each count, to run concurrently. Russo was sentenced to two years in prison and a $5,000 fine.

Although the substantive statute which was violated (18 U.S.C. § 1954) took effect on June 19, 1962, the Government's presentation included facts which antedated the effective date of the statute. The events material to the conspiracy charges commenced in 1961.

In the late Spring of 1961, James Plumeri (Plumeri), a defendant named in the indictment but who before trial was severed from the cases below, asked Herbert Itkin (Itkin), a co-conspirator not named as a defendant and who was the Government's chief witness at trial, to supply him with the names of persons who would be willing to make payoffs in order to obtain mortgages from the Fund. Plumeri would then use his "contact" with the Fund to obtain such mortgages. Plumeri's "contact" was Wenger, who since 1955 had been the auditor and financial adviser to the Fund.

Plumeri asked Jack McCarthy (McCarthy), a defendant (convicted but who did not appeal) to introduce Itkin to Wenger. McCarthy complied and asked Wenger to cooperate with the scheme. Wenger agreed and demanded a fee of 5% of any mortgage loan requested. Russo then asked Itkin to obtain a mortgage for Sam Giamonco (Giamonco), who was building a hospital in Fairlawn, New Jersey. Itkin stated that a 12% fee would be required, 10% in "green" (cash) and 2% by check. Giamonco agreed, but stated that he needed a temporary loan of $400,000 pending approval of the mortgage. During a meeting held in September, 1961, which included Giamonco, Russo, Itkin and John Greco, Giamonco's attorney, Itkin offered to arrange for this temporary loan for a fee

of $15,000. Thereafter, at Russo's instance Giamonco made an initial payment of $7,500 and submitted certain papers concerning the project. Itkin testified that on the basis of Wenger's representations that the mortgage would be granted, he (Itkin) was able to obtain for Giamonco the temporary $400,000 loan from the General Commercial Acceptance Corporation.[2] After the closing of this loan, Giamonco paid Itkin an additional $7,500 of which Russo got $5,000.

In December, 1961, with the meeting of the Board of Trustees of the Fund approaching, Wenger demanded that he be paid $25,000 cash prior to the meeting. He made it clear that if the cash was not produced, the deal was off. Itkin and Russo received $35,000 from Giamonco and flew to Chicago where the Board was about to meet. They paid Wenger the $25,000 and kept $5,000 each. Immediately thereafter, the Trustees approved the loan, although no formal application had been submitted and although a moratorium on the granting of mortgages by the Fund was in effect.

The Fund was willing to commit itself only to the extent of a loan equal to two-thirds the value of the property. This was not enough to meet Giamonco's requirements. After an appraisal which put that value at $1 million, Itkin had Wenger write to the Fund in January, 1962, asking that a loan of $875,000 be approved based on Giamonco's personal guaranty of the full amount of the mortgage and an "investigation" conducted by Wenger of Giamonco's personal financial situation. Wenger then asked Itkin for an additional $20,000. Giamonco, in turn, was required to pay $30,000 of which Itkin, Russo and McCarthy each received $5,000 and Wenger $15,000 rather than the $20,000 he had demanded. The Fund then mailed a letter of commitment to Giamonco's attorney, Greco, on January 30, 1962. Gia-

2. Later, Giamonco arranged to replace this source of temporary financing with a loan from The Chase Manhattan Bank.

monco was still not satisfied and requested that he be required to guaranty the loan only to the extent of $350,000, which request was approved. He also requested an accelerated payout date which was also approved. Whereupon Russo and Itkin collected another $10,-000 from Giamonco which they split.

All the foregoing occurred prior to the effective date of the statute which appellants are accused of violating. However, thereafter Wenger had demanded 5% of the total original amount requested (5% of $900,000 or $45,000) and was still "owed" $5,000, which amount he repeatedly asked to bè paid to him. During 1962 and 1963, Wenger obtained for Giamonco periodic extensions of the loan payout date but he ultimately refused to cooperate further until the $5,000 was paid. Russo, Plumeri and McCarthy all were asked by Itkin to contribute part of the needed $5,000. Russo suggested instead that Itkin get an additional $15,000 from Giamonco and pay Wenger from the money so obtained. Other than that, all three refused to help Itkin raise the money. Finally, on June 20, 1963, Itkin paid Wenger from his own funds, although by that date Itkin was cooperating with the Government. The requested further extension of the loan payout date, which Wenger had refused to act upon pending receipt of the $5,-000, was then granted by the Fund. Thereafter, Giamonco paid Itkin $15,-000; Itkin in turn paid Plumeri and McCarthy $3,500 each and Russo $1,500. On January 10, 1964, the mortgage loan was made by the Fund to the Fairlawn Hospital.

Both appellants contend that prejudicial error was committed by the Trial Court's admission into evidence of acts prior to June 19, 1962. Their argument, in summary, is that there was no statute prohibiting kickbacks prior to that date—hence, no crime. Ergo, there could not have been a conspiracy to commit a crime until the crime was statutorily created, and all evidence before June 19, 1962, should have been excluded.

They point to dates in late January and early February 1962 when they claim that the formal mortgage commitment was issued and argue that, the object of the conspiracy having been fulfilled, the conspiracy had ended. In fact, appellants assert that prior to the statute a conspiracy could not even have existed and cite Article 1, Section 9, Clause 3 of the Constitution that no "ex post facto Law shall be passed." The *ex post facto* question need not be resolved in this case because the proof clearly established that the conspiracy, and overt acts therein, continued long after June 19, 1962.

Merely because appellants' actions prior to June 19, 1962 did not violate § 1954 does not mean that acts committed after that date, done in violation thereof, are in any way excused or that the conspiracy had ended. Here, a number of overt acts occurred after the effective date of the statute. Wenger refused to transmit a request for a delay in the payout date of the loan until Itkin paid him the $5,000 he demanded. Russo was paid $1,500 from the final payoff by Giamonco following the approval of the loan in final form. In addition he had suggested that the final $5,000 demanded by Wenger be raised by asking for the final payment from Giamonco ahead of time. These acts demonstrate that the conspiracy continued after the statute became effective and constitute a sufficient basis for concluding that the appellants violated the statute after its effective date.

Evidence relating to the period antedating the effective date of the statute was admissible in that it showed the intent and purpose of the conspirators' later acts. Christianson v. United States, 226 F.2d 646, 652–653 (8th Cir. 1955), cert. denied, 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859 (1956); Butler v. United States, 138 F.2d 977, 979–981 (7th Cir. 1943). The acts subsequent to June 19, 1962 were a definite part of the same conspiracy. Testimony of prior acts was necessary to enable the jury fully to appreciate the relationship between the

payments which were made after the effective date of the statute and Wenger's "services" to Giamonco in connection with the mortgage.[3]

■ Wenger asserts, supported by Russo, that he was an independent C.P. A. and was not employed by, nor was he an agent of, the Fund. However, Wenger's status was a jury question which was resolved against him. More than ample evidence supports his relationship to the Fund as "counsel, agent." In rendering advice to the Fund on a regular basis, including giving the Fund advice regarding the financial status of potential borrowers, Wenger established an agency relationship with the Fund and, therefore, became a member of the class to which the statute is addressed, whether or not he could also properly be described as a "counsel" to the Fund.[4]

■ Both appellants concentrate heavily upon the Government's chief ("star") witness, Itkin, as a "pathological liar" and "a liar, thief, cheat and perjurer." Reversible error is asserted because of the Trial Court's refusal to order a psychiatric examination. Itkin may well have possessed all of these characteristics and the Government may have been, and probably was, following the precept "Set a thief to catch a thief" but in cases involving crime, the Government's witnesses are rarely pillars of the Church. As long as the jury from its observation has the opportunity to appraise the credibility of the witness in the light of the facts impugning his veracity, this constitutes the constitutional safeguard of a defendant's rights.

Appellants claim that they suffered a denial of their Sixth Amendment rights in that the Government delayed obtaining an indictment against them until just prior to the running of the statute of limitations and that such delay prejudiced the presentation of their defense. However, absent a showing of prejudice, pre-indictment delay does not violate the Sixth Amendment since "the statute of limitations * * * is * * * the primary guarantee against [the] bringing of * * * stale criminal charges." United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); United States v. Feinberg, 383 F.2d 60, 64 (2d Cir. 1967); cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968); United States v. Capaldo, 402 F.2d 821, 823 (2d Cir. 1968). The Sixth Amendment claim must fail here because the Government has justified its delay and because the appellants did not raise timely objection thereto. Itkin, the Government's principal witness, was an informer in numerous other situations about which he was supplying to the Government quantities of information. To protect Itkin's cover, the Government was justified in delaying the indictment of these defendants as long as the statute of limitations allowed. The only fact which appellants advance to show prejudice is that Giamonco died in 1967. They argue that he might have supplied additional evidence helpful to them. Mere

---

3. The Court stated:
 "* * * the government's case is such that they argue that the conspiracy began sometime late in 1961 * * *. [I]f you find that within the period alleged in the indictment all elements of the crime of conspiracy have been demonstrated. * * * then the crime becomes complete."
 The indictment specified March 21, 1962 as the date of the commencement of the conspiracy, which, of course also was before the effective date of the statute. Although the definition of conspiracy found in 18 U.S.C. § 371 (see note 1, *supra*) shows that the term is not properly applied to conduct which is legal, it is un-

derstandable that the District Court at times referred to as a conspiracy the pre-June 19, 1962 manifestations of the course of conduct which after that date was a conspiracy. No error is involved here because the Court made it quite clear to the jury that no conviction could be obtained unless it found that the conspiracy did not end prior to June 19, 1962 and that at least one overt act was committed after that date. That portion of the charge crystallized the jury's fact-finding responsibility in relation to the *ex post facto* problem.

4. Appellants suggest that the term "counsel" is a synonym for "attorney."

speculation to this effect is insufficient and appellants have supplied us with nothing more.[5] Furthermore, appellants failed to make timely objection to this delay. Unlike their co-defendant Plumeri, they did not raise the issue on a pre-trial motion and it was not raised until after the close of the Government's case. This failure constitutes a waiver by appellants of their Sixth Amendment objections. See D'Ercole v. United States, 361 F.2d 211 (2d Cir.), cert. denied, 385 U.S. 995, 87 S.Ct. 610, 17 L.Ed.2d 454 (1966); United States v. Smith, 363 F.2d 417 (2d Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967); United States v. Sanchez, 361 F.2d 824 (2d Cir. 1966). Thus, the delay in securing the indictment was not violative of appellants' constitutional rights. Appellants argue that Wenger does not fall under this definition. That claim is manifestly incorrect.

■ Not surprisingly, the defense at trial used a variety of tactics to discredit Itkin's testimony. On cross-examination, Itkin admitted that he had lied to a grand jury, that he had cheated his clients including an infant and his mother-in-law and that he had been indicted by a grand jury. He claimed at trial that this indictment by the grand jury was a cover but this was directly contradicted by the testimony of an Assistant District Attorney for New York County. The jury was, therefore, fully aware of various negative aspects of Itkin's character. The defense sought to call Mario Brod, who was described as Itkin's contact with the Central Intelligence Agency. It was stated that Brod would testify that he would not believe Itkin under oath and that Itkin's reputation for truthfulness was bad. In a situation where the jury's judgment as to Itkin's credibility was of great importance, any testimony reflecting upon Itkin's veracity was relevant. However, exclusion of this testimony does not necessarily constitute reversible error. There was ample other testimony before the jury on the basis of which it could have concluded that Itkin was unworthy of belief. Exclusion of this additional testimony thus falls into the category of harmless error.

■ Appellants suggest that the Court erred in refusing the request of the defense[6] that Itkin be required to submit to a psychiatric examination. Ordering a witness to undergo a psychological examination is a drastic measure. Although apparently Itkin did consult two psychiatrists, his relationship to them seems to have been related to his marital difficulties and treatment being afforded his wife. In any event, the determination of whether a witness should undergo a psychiatric examination is a matter "particularly within the discretion of the trial court." United States v. Lee Wan Nam, 274 F.2d 863, 865 (2d Cir.), cert. denied, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1147 (1960). The District Court clearly did not abuse its discretion.

■ Wenger further claims that the Court should have instructed the jury on the issue of entrapment[7] since Itkin

---

5. Itkin originally had refused to implicate anyone in connection with the Fairlawn mortgage. That Giamonco's death occurred before Itkin's change of heart was hardly significant. The chief significance of that fact was that there were probably four defendants in the case rather than five.

6. The government suggests that appellants have no standing to challenge this ruling since they did not join in the application at trial. We find the record somewhat ambiguous as to whether McCarthy's attorney may not have implied that he was speaking on behalf of all defendants, and, therefore, chose to rule on the merits of this issue without deciding the question of standing.

7. In fact, the Court did charge that if the jury found Itkin, at the time he gave Wenger the final $5,000, was a Government agent and that he "pressed the cash on Wenger * * * merely to set him up for a federal criminal charge and that Wenger took the cash for reasons having nothing to do with the loan or the fund," the jury should acquit.

was, in effect, a government agent at the time he made the final $5,000 payment. This argument overlooks the fact that it is undisputed that the Government did not initiate this scheme. At its inception Itkin was not working with the Government, and the final $5,000 payment was made only after repeated requests by Wenger. Furthermore, Wenger refused to take action on the requested extension of the payout date of the loan until such sums were paid. Since the Government did not initiate either the scheme as a whole or the final payoff, there was no entrapment. United States v. Weiser, 428 F.2d 932 (2d Cir. 1969).

The judgment of conviction as to both appellants is affirmed.