UNITED STATES of America
Appellee,

v.

William BINDER et al., Appellants.

Nos. 170, 183 and 184, Dockets 71–1434,
71–1440 and 71–1810.

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1971.

Decided Dec. 16, 1971.

Harold F. McGuire, Jr., Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., and Peter F. Rient, Asst. U. S. Atty., on brief), for appellee.

Daniel H. Greenberg, New York City, for appellant William Binder.

Arthur Hirsch, New York City (Alan F. Scribner, New York City, on brief), for appellant Max Blauner.

Frederic Block, Centereach, N. Y., for appellant Edward Samuels.

Before LUMBARD, MULLIGAN and OAKES, Circuit Judges.

LUMBARD, Circuit Judge:

William Binder, Max Blauner and Edward Samuels appeal their convictions for conspiracy and substantive offenses designed to evade payment of approximately $7 million owed under the Interest Equalization Tax (I.E.T.) on the trading of $45 million worth of foreign issue stocks in 1964 and 1965. We affirm the convictions.

█ The principal contention of the appellants is that their convictions are in violation of Article I, section 9 of the Constitution which provides "No Bill of Attainder or *ex post facto* Law shall be passed" as the government was allowed to prove what the defendants had done prior to the passage of the statute on September 2, 1964. We find no merit in this argument.

The indictment, filed November 29, 1966, contained 13 counts, of which we need to note only eight.[1] Count 1 charged Henry Scharf and the three appellants with conspiring, from November 1963 to February 1965, to evade the I.E.T. and defraud the United States by filing false and fraudulent returns for the quarters ending September 30, and December 31, 1964, and March 31, 1965. 18 U.S.C. § 371. Counts 2, 4 and 6 charged all defendants with attempted evasion of Scharf's I.E.T. 26 U.S.C. § 7201. Counts 9 through 12 charged all defendants with aiding, procuring and counseling the preparation and presentation of false and fraudulent I.E.T. returns on November 27 and November 30, 1964, and February 1, 1965. 26 U.S.C. § 7206(2); 18 U.S.C. § 2. Binder was convicted on Counts 1, 4 and 6, and Blauner and Samuels on Counts 1, 2, 4, 6, 9, 10, 11 and 12. Scharf, being a fugitive, was severed from the trial.

The enactment on September 2, 1964 of the I.E.T. statute, 26 U.S.C. § 4911 et seq., was preceded by many months of discussion in the Congress, which followed a message to Congress from President Kennedy on July 19, 1963, regarding methods of reducing the flow of capital funds from the United States. Designed to correct the flow of short-term capital from the United States, the I.E.T. statute levied an excise tax of up to 15% on the acquisition of foreign-issue stock by United States citizens from non-citizens.

As soon as it became known in financial markets, about March 1964, that passage of the I.E.T. was likely, American-owned foreign stock sold to United States citizens commanded a premium over foreign-owned foreign stock sold to United States citizens because no I.E.T. would become due on the former sales. Thus, in the few months prior to the enactment of the I.E.T., an American could purchase foreign-owned foreign stock and sell it at a small profit as American-owned foreign stock. This arbitrage profit, however, was not enough to cover the amount of the I.E.T. that would come due if the tax were passed.

To curb the capital flow while Congress was considering the legislation and to avoid arbitrage speculation, the President's original message to Congress on the I.E.T. asked that the tax be made retroactive. 109 Cong.Rec. 12,806 (Senate), 12,940 (House) (1963). When passed, the statute provided that taxes were to be imposed on all affected transactions in foreign stock which took place after July 19, 1963,[2] the date of the President's message.

---

1. Counts 3, 5, 7, 8 and 13 were dismissed during the trial, and, as to Binder, the court also dismissed counts 9 through 12. The jury acquitted Binder on count 2.

   Judge Mansfield sentenced Blauner and Samuels to 18-month prison terms on each count, the terms to run concurrently. Binder was fined $2,000 on the conspiracy count; sentence on counts 4 and 6 was suspended and he was placed on probation for two years.

2. "[A] prospective date for the Interest Equalization Tax would have made it a fruitless—if not counterproductive exercise . . . . Without a retroactive effective date from the time of an-

In March 1964, the bill which was to become the I.E.T. passed the House of Representatives with its retroactive features intact and its likely passage through the Senate then apparent, and, at the very same time, Henry Scharf and the defendants began to deal through dummy corporations in an arbitrage scheme designed to recover for themselves the profit that an American citizen could receive by dealing in foreign stock if he was able to evade the I.E.T.

In March 1964, Weston Trading Corporation, an American corporation controlled by Scharf through Management House, Inc. began heavy trading in foreign securities. Foreign-owned foreign stock was bought by Weston and sold as American-owned foreign stock. The money for the transactions was supplied by Scharf as Weston had no assets.

In April 1964, a similar arbitrage account was opened by defendant Samuels' father, Sidney Samuels and one Bernard Luckman, in the name of Hondo Trading Corporation.[3] Hondo also had no assets and the money for its purchases was supplied by Luckman and Samuels. In July 1964, Scharf acquired control of Hondo.

Weston and Hondo traded in foreign-owned foreign stock until August 1964. Blauner and Samuels were customers men at Coggeshall & Hicks, a New York brokerage house, and they handled all the transactions for the two corporations. The arbitrage profits on the sales were approximately $30,000 in addition to $177,000 paid to Blauner and Samuels in the form of brokerage commissions and other expenses. Part of these commissions was kicked back to Scharf. No I.E.T. was ever paid, although the government proved I.E.T.

liabilities due on the corporations' transactions amounting to nearly $7 million.

In August 1964, after a meeting among Scharf, Blauner and Samuels, the defendants stopped trading through Weston and Hondo and Blauner began looking for an American citizen living in Canada who would be willing to sign his name to documents that showed that the stock purchases were made for his account. Binder, who was a long-time Scharf associate, introduced to Scharf one William Hazael who was an American citizen living in Canada. To get Hazael to agree to sign the necessary papers, Scharf agreed to pay him $150 per week; in return Hazael signed the necessary certificates of American ownership that were presented to him. Blauner and Samuels purchased foreign-owned foreign stock with Scharf's money in Hazael's name, from September 1964 until March 1965. The profits on these sales were $263,413 of which Hazael received only $4,939. Commissions on the sales, which were conducted by Carl Pollack, a co-worker of Samuels, amounted to $80,000, part of which Pollack kicked back to Samuels.

Although Hazael's tax returns had revealed substantial tax liabilities, no payments accompanied the returns. When the IRS moved to collect the money, Scharf told Hazael to "sit tight" and had Binder continue to pay Hazael the $150 weekly in cash. Scharf then sent Hazael an affidavit to sign which exonerated Scharf from any liability in the sale of the stocks, recited falsely that Hazael's family had an interest in local cannery, that Hazael had full knowledge of the I.E.T. and that Hazael had told Scharf that he was unaffected by the I.E.T. for which reason Scharf had undertaken to sell the stocks for him. Hazael signed the affidavit, but after thinking

nouncement, the outflow of capital in an extremely short period of time would have been so great that Congress could not have afforded to act." Note, Setting Effective Dates for Tax Legislation: A Rule of Prospectivity, 84 Harv. L.Rev. 436, 445 (1970).

3. Sidney Samuels was indicted as a conspirator but died prior to trial. Bernard Luckman was not indicted as he apparently was unaware of the criminal use being made of his money.

it over, went to the IRS with the affidavit instead of returning it to Scharf.

When Binder was summoned in July 1965 to testify before a grand jury investigating the sales, he attempted to rely on the same story as was told in the affidavit which Scharf had sent to Hazael.

We are of the view that, on this evidence, the convictions of the appellants do not violate the *ex post facto* clause of the Constitution.

The *ex post facto* clause erects a *per se* barrier against prosecution by the government for an act legal when done, but later made illegal. See Calder v. Bull, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). Appellants' convictions, by contrast, are all based on acts which were illegal at the time committed.

■ Congress unquestionably has the power to enact a tax bill with a retroactive tax effective date. See generally Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv.L.Rev. 692 (1960). Once the I.E.T. became law, the tax owed on foreign-issue stock transactions had to be paid; the filing of fraudulent returns regarding such transactions was punishable under then-existing statutes. As the proof shows, the defendants were convicted only because they attempted to evade the tax after it became due. The evidence of the appellants' action prior to the enactment of the I.E.T. did not provide the basis for their convictions, but was admitted to prove the existence of the conspiracy and its purpose, their brazen scheme to profit from evasion of a law which would soon take effect, and the wilfulness of their evasion of the tax once the law was enacted. The convictions themselves, being based on post-September 2, 1964 acts, were constitutional.[4]

Moreover, appellants all knew at the time of their illegal acts that they were violating the I.E.T. The arbitrage trading did not begin until March 1964 when in response to the imminent passage of the I.E.T., the market recognized a differential in price between foreign-owned foreign stock and American-owned foreign stock because of the anticipated tax consequences. Only sophisticated investors could have benefitted from this spread. Appellants cannot now claim that they have been convicted for acts innocently done in ignorance of their liability under the law.

Counts 9 to 12, which charged Blauner and Samuels with aiding and counseling the preparation of fraudulent I.E.T. returns, listed the dates of these activities as November 24, 1964, November 30, 1964 and March 1, 1965. Since each of these dates was after September 2, 1964, it is apparent that Blauner's and Samuels' convictions on these counts did not violate the *ex post facto* clause.

Count 1 charged Binder, Blauner and Samuels with conspiracy to evade payment of the I.E.T. As our account of the proof shows, there is substantial evidence that each of the three was a participant in the conspiracy and that each had engaged in overt acts after September 2, 1964. The evidence relating to pre-September 2, 1964 acts was admissible to prove the existence and purpose of the conspiracy. Since each appellant reaffirmed his participation in the conspiracy after September 2, 1964 the convictions do not violate the *ex post facto* clause. See Christianson v. United States, 226 F.2d 646 (8th Cir. 1955), cert. denied, 350 U.S. 994, 76 S.Ct. 543, 100 L.Ed. 859 (1956).

4. Judge Mansfield's charge was properly designed to allow the jury to consider the pre-September 2, 1964 acts of appellants as some evidence of a post-September 2, 1964 conspiracy and of the appellants' wilful evasion of the I.E.T. Appellants excepted to the charge on only one ground—that no pre-September 2, 1964 acts should have been considered by the jury in its determination of whether there was an unlawful conspiracy. This request was correctly denied by Judge Mansfield for the pre-September 2, 1964 acts were evidence both of the beginnings of the enterprise and the intent of the defendants.

Counts 2, 4 and 6 charged Binder, Blauner, and Samuels with attempted evasion of the I.E.T. The trial judge properly charged the jury that the appellants could be convicted on all counts if it found beyond a reasonable doubt that the appellants knew that the stock purchases were not for Weston's, Hondo's or Hazael's account and if the jury found that appellants had aided in the preparation of fraudulent I.E.T. returns. These are precisely the acts for which the jury convicted Blauner and Samuels on Counts 9 to 12. Since the preparation of the fraudulent returns occurred after September 2, 1964, Blauner and Samuels can have no valid *ex post facto* claim.

■ There is adequate proof of Binder's complicity. He found Hazael and introduced him to the other defendants. He paid Hazael's airfare to New York. Shortly thereafter he met with Scharf and Hazael in Detroit, and the jury could have found that in Binder's presence Scharf explained to Hazael what the latter was expected to do and that Hazael was there guaranteed a job for five years. From this evidence Binder must have known that Hazael, an American citizen living abroad, was to be used as a dummy for the large purchases and sales of foreign-owned foreign securities. Moreover, after Hazael learned in January 1965 of the tremendous tax liability he had unknowingly incurred, Binder began to make the payments of the $150 weekly owing to Hazael in cash. Binder's explanation to the grand jury that he had borrowed $3,000 from Hazael and was repaying it at $150 a week was such that the jury which convicted him might have concluded that his entire story was false.

■ The other contention of the appellants may be disposed of briefly. They argue that the delay of their trial for three years after the indictment was brought violated their sixth amendment right to speedy trial. Not only did defendants fail to demand a trial, a prerequisite to any speedy trial claim in this circuit prior to July 5, 1971,[5] see United States v. Aberson, 419 F.2d 820 (2d Cir.), cert. denied, 397 U.S. 1066, 90 S.Ct. 1497, 25 L.Ed.2d 687 (1970); United States v. Maxwell, 383 F.2d 437 (2d Cir. 1967), cert. denied, 389 U.S. 1057, 88 S.Ct. 809, 19 L.Ed.2d 856 (1968), but also they have failed to show that the delay prejudiced them in any way. Obviously one of the principal reasons for the government's delay in moving for trial was the fugitive status of Henry Scharf, the principal defendant.

■ Samuels argues that hearsay testimony relevant to the conspiracy count was improperly admitted against him on the substantive counts. This claim also lacks merit. In United States v. Branker, 418 F.2d 378, 380 (2d Cir. 1969), we said "[E]vidence of what they said in order to carry out the scheme was just as relevant and admissible against anyone participating in the scheme on the trial of a substantive count as it would be on the trial of a conspiracy."

■ Blauner contends that his grand jury testimony was improperly admitted against him at trial because he was not advised when he appeared before the grand jury that he was a potential defendant. There is substantial doubt whether the government actually thought that Blauner was a prospective defendant when he was brought before the grand jury. Thus no warning at all may have been in order. See United States v. Scully, 225 F.2d 113, 116 (2d Cir.), cert. denied, 350 U.S. 897, 76 S.Ct. 156, 100 L.Ed. 788 (1955) ("the mere possibility that the witness may later be indicted furnishes no basis for requiring that he be advised of his rights under the Fifth Amendment when summoned to give testimony before a Grand Jury").

In any event, before he testified Blauner was given the *Miranda* warnings.

5. Second Circuit Rules Regarding Prompt Disposition of Criminal Cases (promulgated January 5, 1971, as amended May 24, 1971).

If these warnings are adequate to protect a defendant in the hostile environment of custodial interrogation they are surely sufficient with a witness appearing before a grand jury of citizens to be questioned by a government attorney, with a record of the proceedings made by a stenographer. Fully warned, Blauner elected to answer questions. His testimony was properly received in evidence. *Cf.* Harris v. New York, 401 U. S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

Affirmed.