UNITED STATES of America, Appellee,

v.

Fred FERRARA et al., Appellants.

No. 534, Docket 71-2121.

United States Court of Appeals, Second Circuit.

Argued Feb. 17, 1972.

Decided April 7, 1972.

Certiorari Denied June 26, 1972. See 92 S.Ct. 2498.

Irving Anolik, New York City, for appellants.

Richard Ben-Veniste, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., Jeffrey Harris and Peter F. Rient, Asst. U. S. Attys., New York City., on the brief), for appellee.

Before FEINBERG and TIMBERS, Circuit Judges, and THOMSEN, District Judge.*

TIMBERS, Circuit Judge:

These appeals graphically depict how corrupt labor union officials can use their positions to promote their own selfish interests at the expense of the interests of those they ostensibly represent.

Appellants Fred Ferrara, Arthur Russell, Elmer Hauck and George Papalexis[1] were convicted after a three-

1. Several weeks after oral argument, appellant George Papalexis died. His appeal therefore is moot.

day non-jury trial in the District Court for the Southern District of New York, Milton Pollack, District Judge, of conspiring to violate and of violating §§ 302(a)(1), (a)(4) and (b)(1) of the Taft-Hartley Act, 29 U.S.C. §§ 186(a)(1), (a)(4) and (b)(1) (1970), by demanding and receiving money and a thing of value from employers of employees whom they represented. The trial judge fined each appellant $4500, and Ferrara, Russell and Hauck received prison terms of one year, two months and one month, respectively. On appeal, appellants claim that the evidence was insufficient to support the trial judge's findings; that the government failed to show that the Taft-Hartley Act applied to the payments in question; that the application of the Taft-Hartley Act, as amended in 1959, to their activities violated the *ex post facto* clause of the Constitution; and that they were denied their right to a speedy trial. Finding no error, we affirm.

## I.

The evidence presented at trial established that from 1954 through 1965, the period covered by the indictment, appellants and co-defendant James Gleason [2] were officers of Local 11, Chain Service Restaurant, Luncheonette and Soda Fountain Employees and Bartenders Union (AFL–CIO) (hereafter "Local 11"). During this same period, Local 11 represented employees of the Walgreen Company.

During the course of contract negotiations between Walgreen and Local 11 in 1954, management's representative, co-conspirator Casey LaFramenta, complained that the provision in the contract which allowed fountain employees to eat free of charge was costing the company a great deal and that its New York employees were the only ones in the nation with such a "free food" provision. Gleason, the union's business

agent for Walgreen's employees, and Ferrara, then president of Local 11, told LaFramenta that the "free food" provision could not be eliminated.

Thereafter, appellant Ferrara approached Gleason privately about the prospect of convincing Walgreen employees to give up the free food benefit. Ferrara explained that if the employees would accept a modification of this benefit and if Ferrara could persuade Walgreen to purchase its coffee from Abraham Wechsler, chairman of the board of Wechsler Coffee Company, then Ferrara, Gleason, Russell, Hauck and Papalexis could arrange a lucrative deal which would earn them several thousand dollars. Gleason agreed to help Ferrara implement this proposal.

At about this time, Ferrara asked Walgreen's negotiator, LaFramenta, whether Walgreen would purchase its coffee from Wechsler. LaFramenta relayed this suggestion to Donald Haas, who was then head of the Walgreen purchasing division. Thereafter, Local 11 dropped its demand that the free food provision be included in the contract.

Gleason then used his position as union business agent for the Walgreen employees to convince them to accept a modification of the food benefit provision. The Walgreen employees eventually agreed to give up free food in exchange for a $3 weekly increase in salary and a 50% discount on food purchases.

In exchange for Local 11's promoting this modification of the food benefit provision, Walgreen agreed to purchase its coffee from Wechsler. Ferrara then arranged with Edward Wechsler, brother of Abraham Wechsler, to have Wechsler Coffee make an annual payment to a person designated by Ferrara, Hauck or Russell of four cents a pound on all sales of Wechsler coffee to Walgreen.

Thus, from 1954 to 1965, Walgreen purchased its coffee requirements in the

2. Co-defendant Gleason was named in only the first count of the five-count indictment, charging him with conspiracy to violate 29 U.S.C. § 186 (1970). Gleason pleaded guilty to this count prior to trial and testified as a witness for the government.

New York City area from Wechsler Coffee, despite the absence of any business justification for doing so. Prior to 1954, Walgreen had been using coffee roasted and ground in its own plant in Chicago, and Walgreen's representatives could give no plausible explanation for changing its source of supply. Moreover, while Walgreen was purchasing its coffee from Wechsler, James Plummer, the food and fountain supervisor for Walgreen's New York stores, received numerous consumer complaints about the coffee, and informed his superiors that the coffee was overpriced and of poor quality. Plummer was told by co-conspirator LaFramenta to "keep [his] hands off the coffee." Plummer was later told that Wechsler coffee would be purchased because Local 11 had "something to do with it."

Furthermore, each year from 1954 through 1965, Wechsler Coffee made the agreed upon payments to nominees of Ferrara, Hauck and Russell. In 1954, 1955 and 1956, Ferrara paid Gleason $800, $700 and $650–700 in cash, respectively, as Gleason's share on the Wechsler deal. In 1957 and 1958, Ferrara gave Gleason checks drawn on the account of Wechsler Coffee, payable to Gleason. Gleason then cashed the checks and divided the proceeds equally with Ferrara, Russell, Hauck and Papalexis. In 1959, the check was made payable to Riese Enterprises, owned by Irving Riese, Ferrara's brother-in-law. In 1961, 1962, 1963 and 1964, the Wechsler checks were made payable to Rudolph Wetter, Gleason's cousin. After each check was cashed, Wetter received 10% of the proceeds, and appellants reimbursed Wetter for whatever income tax liability he incurred. In 1965, the check also was made payable to Wetter, who again received 10% of the proceeds. However, this year, rather than dividing the proceeds equally between the five defendants as had been done in each previous year, Gleason kept half of the proceeds and gave the other half to Ferrara.

To uphold their end of this tripartite arrangement, appellants, who as previously noted were officers of Local 11, did not again demand that the free food provision be included in the collective bargaining agreements negotiated by appellants on behalf of Local 11 in each of the years 1959, 1962 and 1965.

Shortly after appellants received their 1965 payment from Wechsler, Walgreen discontinued the use of Wechsler coffee.

II.

■■ Appellants' first argument is that the evidence was insufficient as a matter of law to establish their guilt, as the government relied primarily on the testimony of James Gleason, a co-defendant, to prove its case. This claim, however, ignores the well established rule that a guilty verdict may rest upon the uncorroborated testimony of an accomplice. United States v. Phillips, 426 F. 2d 1069, 1071 (2 Cir.), cert. denied, 400 U.S. 843 (1970); United States v. Corallo, 413 F.2d 1306, 1323 (2 Cir.), cert. denied, 396 U.S. 958 (1969). Moreover, an examination of the record reveals that the essential elements of Gleason's testimony were corroborated by the testimony of numerous other witnesses. Co-conspirator Abraham Wechsler testified that after lending Ferrara $8,000 in early 1954, he asked Ferrara whether Ferrara would be able to acquire any business for Wechsler Coffee. Ferrara said he would try. Wechsler further testified that the arrangements for the annual payment to the appellants or their nominees were negotiated with Ferrara and that each year it was Ferrara, Russell or Hauck who designated the payee of the annual checks. Furthermore, co-conspirators Irwin Chapman, an officer of Wechsler Coffee, and Rudolph Wetter also corroborated Gleason's testimony concerning receipt of the Wechsler payments. The government also introduced cancelled checks which documented the payments from Wechsler Coffee to appellants or their nominees for every year except 1954, 1955 and 1960. In addition, Gleason's story about the arrangement be-

tween Walgreen and Local 11 was corroborated by Plummer, a Walgreen employee, who testified that when he complained to his superiors about the price and quality of Wechsler coffee, co-conspirator LaFramenta told him to "keep [his] hands off the coffee." Plummer was later informed that Wechsler coffee would continue to be purchased because Local 11 was involved.

In another argument addressed to the sufficiency of the evidence, appellants contend that even if Gleason's testimony were sufficient to show that Wechsler Coffee Company made annual payments to appellants, the government failed to establish that these payments were outlawed by § 302 of the Taft-Hartley Act, 29 U.S.C. § 186. The resolution of this issue requires a brief summary of the theories upon which the government relied to prove violations of the various provisions of this statute.[3]

The government relied on three theories to show that appellants had conspired to violate 29 U.S.C. § 186[4]: (1) by receiving annual payments from an employer (Rikers Restaurants and Restaurant Associates) of members of their union, in violation of §§ 186(a) (1) and (b) (1); (2) by receiving a "thing of value" (an agreement to purchase Wechsler coffee) from another employer (Walgreen) of members of their union, in violation of §§ 186(a) (1) and (b) (1); and (3) by receiving annual payments from employers (Abraham Wechs-ler, James Slater and Irwin Chapman) with intent to be influenced as union officials, in violation of §§ 186(a) (4) and (b) (1). A review of the record reveals that the government presented sufficient evidence to support each one of these three theories.

With respect to the first theory, appellants' claim that the government failed to show that Wechsler and his subordinates were employers of employees represented by appellants is without merit. It is true that Wechsler Coffee did not employ anyone represented by Local 11. The evidence presented at trial showed, however, that during the period covered by the indictment, Local 11 organized the employees of many of the restaurants operated by Restaurant Associates, Inc., a corporation which operates a wide variety of food service establishments ranging from luxury restaurants to coffee shops and cafeterias, all of which are in the New York Metropolitan area. The evidence also indicated that Rikers Restaurants, Inc., a chain of fourteen restaurants, had been organized by Local 11 prior to 1954. The government then showed that Abraham Wechsler and his immediate family ran Rikers Restaurants and Restaurant Associates during the period covered by the indictment. Abraham Wechsler testified that in 1954 he was sole stockholder of both companies. In 1956, Wechsler began giving away his shares to his family, including

3. Section 302 of the Taft-Hartley Act, 29 U.S.C. § 186, provides in relevant part:
"(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—
(1) to any representative of any of his employees who are employed in an industry affecting commerce; or
\* \* \* \* \*
(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his ac-tions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.
(b) (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."

4. The conspiracy was charged in Count One of the indictment. Counts Two through Five of the indictment alleged substantive violations of the Taft-Hartley Act, and relied upon the same theories as were relied upon in the conspiracy count to show violations of §§ 186(a) (1), (a) (4) and (b) (1).

his son-in-law, co-conspirator James Slater. During the entire period covered by the indictment, Wechsler and his family continued to control Restaurant Associates and Rikers Restaurants. Even after a public offering of Restaurant Associates stock in 1961, the Wechsler family was to retain 62% of its common stock. Although Wechsler was no longer a director of Restaurant Associates in 1961, he continued to control the business. James Slater, who was secretary-treasurer and later president of Wechsler Coffee, was a director of Restaurant Associates from 1961 on. Wechsler's personal control over Restaurant Associates was demonstrated by his ability to have his other son-in-law, Jerome Brody, removed from the presidency of Restaurant Associates in 1963, after Brody and Wechsler's daughter were separated. Furthermore, in 1963, Wechsler arranged for co-conspirator Irwin Chapman, then secretary-treasurer of Wechsler Coffee, to be named a director of Restaurant Associates, although Chapman was, at most, a nominal shareholder in that company. In view of these facts, there was sufficient evidence to support Judge Pollack's finding that Abraham Wechsler, James Slater and Irwin Chapman, by virtue of their control over and involvement with Restaurant Associates and Rikers Restaurants, were employers or persons acting in the interest of employers, within the meaning of 29 U.S.C. § 186(a).

Appellants' claim that the evidence was insufficient to show that Walgreen promised to buy its coffee from Wechsler also is refuted by the record. The existence of this promise is shown by Walgreen's purchasing its coffee requirements from Wechsler from 1954 through 1965 despite Walgreen's dissat-

isfaction with the price and quality of Wechsler coffee. Moreover, when Plummer, a Walgreen employee, made complaints about the coffee, he was informed that coffee would continue to be purchased from Wechsler because Local 11 was involved. Furthermore, in view of the fact that Walgreen had its own roasting plant which had supplied its coffee in New York prior to 1955, Local 11's involvement with Wechsler provides the only plausible explanation for Walgreen's purchasing coffee from Wechsler. Moreover, Walgreen's agreement with appellants to switch coffee suppliers was a "thing of value" within the meaning of 29 U.S.C. § 186(a) (1), since the agreement enabled defendants to exact a "commission" on every pound of coffee sold to Walgreen thereafter.

There also was ample evidence to show that appellants had conspired to violate 29 U.S.C. §§ 186(a) (4) and (b) (1), since the money was requested by them and received by appellants with the intent of being influenced as union officials.[5] As previously noted, the evidence showed the existence of an arrangement, pursuant to which Walgreen would buy its coffee requirements from Wechsler Coffee, Wechsler Coffee would pay appellants a commission on the coffee sold to Walgreen, and the union would relinquish its demand for retention of the "free meal" provision in its contract with Walgreen. The fact that relinquishing the "free food" provision was unacceptable to Gleason and Ferrara, until it appeared that they could use their position to make a profit out of relinquishing the free food provision, indicates that appellants received the money with the intent of being influenced in their actions as officers of Local 11. Moreover, the fact that this ar-

---

5. Contrary to appellants' assertions, 29 U. S.C. § 186(a) (1) does not require a showing of intent to influence. Appellants' misinterpretation is most likely attributable to some language in United States v. McCarthy, 422 F.2d 160, 162 (2 Cir.), appeal dismissed, 398 U.S. 946 (1970), where this Court said that ". . . [§ 186] makes such payments unlawful only if

they were intended to influence the actions of the recipient in relation to the union of which he is an officer." While this statement is true with respect to § 186(a) (4), it is clear from the statutory language that intent to influence is not a requisite element of § 186(a) (1). See footnote 3, *supra*.

rangement was adhered to despite the demands of some members that the free food provision be reinstated indicates that appellants continued to receive the money with the intent of being influenced.

### III.

Relying on the theory that their conduct could not have been criminal prior to the 1959 amendments to the Taft-Hartley Act, appellants maintain that the introduction of evidence concerning their activities prior to September of 1959 was reversible error and that the application of the amended statute to them constituted a violation of the *ex post facto* clause of the Constitution. These claims are without merit.

■ Even assuming appellants' activities were not criminal prior to the 1959 amendments to the Taft-Hartley Act,[6] the application of amended 29 U.S.C. § 186 to the conspiracy did not violate the *ex post facto* clause. Although the evidence established that the initial agreements among appellants Walgreen and Wechsler Coffee were consummated in 1954, there was clear proof that the conspiracy was reaffirmed and adhered to long after September of 1959. Merely because appellants' actions prior to 1959 did not violate § 186 does not mean that

acts committed after that date, done in violation thereof, are in any way excused or that the conspiracy had ended. Here, a number of overt acts, the most obvious of which were the annual payments to appellants, occurred after the effective date of the amendments to the Taft-Hartley Act. Accordingly, the *ex post facto* clause was not violated, as the conspiracy, and overt acts in furtherance thereof, continued long after the 1959 amendment to the statute.[7] See United States v. Binder, 453 F.2d 805, 808 (2 Cir. 1971); United States v. Russo, 442 F.2d 498, 501 (2 Cir. 1971), cert. denied, 404 U.S. 1023 (1972).

■ Furthermore, the trial judge did not commit reversible error in admitting evidence relating to the period before the statute was amended. Such evidence was admissible to show the existence and purpose of the conspiracy, as well as to prove the intent and purpose of the conspirators' later acts. In view of the fact that the conspiracy continued long after 1959, evidence of prior acts was both admissible and necessary to enable the trial judge to appreciate fully the reasons for the payments made after 1959. United States v. Binder, *supra,* 453 F.2d at 808; United States v. Russo, *supra,* 442 F.2d at 501–02; Christianson v. United States, 226 F.2d 646,

---

6. It appears that appellants' activities constituted a conspiracy to violate 29 U.S.C. § 186 prior to its amendment in 1959. By § 505 of the Landrum-Griffin Act of 1959, § 302(a) of the Taft-Hartley Act, 29 U.S.C. § 186(a), was merely broadened to reach an array of intermediaries, such as labor consultants, who served essentially to transmit payments from management to corrupt labor officials. Before the Landrum-Griffin amendments, § 186(a) read:
   "It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."
   Moreover, prior to the 1959 amendments, § 186(b) read as follows:
   "It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or

accept, from the employer of such employees any money or other thing of value."
   Thus, prior to 1959, it would appear that appellants conspired to violate 29 U.S.C. §§ 186(a) and (b) by obtaining Walgreen's agreement to buy Wechsler coffee (a "thing of value" to the union officials) and by receiving payments from Wechsler who controlled Rikers Restaurants whose employees were represented by appellants.

7. The argument that the application of the amended statute to appellants' activities violated the *ex post facto* clause applies only to the conspiracy count, Count One of the indictment. The substantive counts on which appellants were convicted (Counts Two through Five) related to payments received by them in 1964 and 1965, well after the amendment of the statute.

652–53 (8 Cir. 1955), cert. denied, 350 U.S. 994 (1956).

### IV.

Appellants' final contention, that they were denied their right to a speedy trial, is equally without merit.

 The indictment in the instant case was returned on April 21, 1969, slightly less than four years after the last payment to appellants by Wechsler Coffee. Appellants claim they were denied their Sixth Amendment right to a speedy trial in that the government delayed obtaining an indictment against them until just prior to the running of the statute of limitations. The Sixth Amendment, however, is of no avail to appellants; its speedy trial provision has no application until one becomes an "accused" by being arrested or charged. United States v. Marion, 404 U.S. 307, 318 (1971).

■ Moreover, it likewise is clear that the due process clause of the Fifth Amendment does not help appellants, for they have failed to show that the pre-indictment delay caused substantial prejudice to their right to a fair trial or that the delay was a purposeful device to gain tactical advantage over them. Other than alleging the dimming of memories, appellants have not shown how the pre-indictment delay prejudiced them. Moreover, with respect to the reason for the delay, co-defendant Gleason, the government's principal witness, was not expelled from the union until September 1967. The indictment therefore was filed less than two years after Gleason agreed to cooperate. In view of the complicated nature of this case, it cannot be said that the delay was a deliberate tactical decision to gain advantage over appellants.

■ In any event, since appellants failed to object in the district court to the alleged denial of their right to a speedy trial, such claim may not be raised on appeal. See United States v. Russo, *supra*, 442 F.2d at 503.

Affirmed.[8]

---

8. In 1971, we affirmed the convictions of appellants Ferrara and Russell for violating the Landrum-Griffin Act, officially called the Labor-Management Reporting and Disclosure Act of 1959. United States v. Ferrara, 451 F.2d 91 (2 Cir. 1971), cert. denied, 405 U.S. 1032, 92 S.Ct. 1291, 31 L.Ed.2d 489, (1972). None of the issues in our earlier decision has any bearing on our decision today.