630 F.2d 192
 106 L.R.R.M. (BNA) 2611
 UNITED STATES of America
v.
PALMERI, Ernest P., Sr., Appellant in No. 79-2147.
UNITED STATES of America
v.
CAMPISANO, Joseph, Appellant in No. 79-2148.
UNITED STATES of America
v.
CARIELLO, Vito, Appellant in No. 79-2149.
UNITED STATES of America
v.
SMITH, Frank, Appellant in No. 79-2150.
UNITED STATES of America
v.
CHESTNUT, Flen, Appellant in No. 79-2424.
 Nos. 79-2147 to 79-2150 and 79-2424.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 5, 1980.
Decided Sept. 3, 1980.
 
 Kenneth Michael Robinson, Washington, D. C., for appellants Palmeri and smith.
 Dennis M. Hart, Washington, D. C., for appellant Chestnut.
 Steven H. Gifis, Princeton, N. J., for appellant Campisano.
 Frederic J. Gross, Haddonfield, N. J., for appellant Cariello.
 Robert J. Del Tufo, U. S. Atty., Kenneth N. Laptook, Asst. U. S. Atty., Newark, N. J., for appellee.
 Before ALDISERT and SLOVITER, Circuit Judges, and HANNUM, District Judge.*
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 These consolidated appeals from a jury verdict of conviction present a number of questions for consideration. The first issue concerns the proper scope of 18 U.S.C. § 1954, which proscribes the receipt of kickbacks and other illegitimate benefits by persons associated with employee benefit plans. The second issue is whether the district court failed to distinguish transactions involving money covered by § 1954 from transactions involving money not covered by that section. Third, we must determine whether the court erred in submitting special interrogatories to the jury. Finally, we must decide whether the government produced insufficient evidence to support each conviction under 18 U.S.C. §§ 1962(c) and (d), which proscribe transactions and conspiracies related to racketeering enterprises. We hold that the government produced insufficient evidence to support the conviction of appellant Flen Chestnut, and we will therefore reverse his conviction. We resolve all other issues against appellants, however, and the other convictions will therefore be affirmed.
 
 
 2
 Local 945 of the International Brotherhood of Teamsters, with offices at West Paterson, New Jersey, was an employee organization within the meaning of 18 U.S.C. § 1954, and maintained three collective bargaining funds: a Pension Fund; a Welfare Fund, which provided hospitalization and related benefits to the members; and a Severance Fund, which made payments to retired or laid-off workers from individual accounts. The local also maintained a treasury consisting of unearmarked union monies. Both the Welfare Fund and the Severance Fund were "employee welfare benefit plans" within the meaning of § 1954 and were covered by the Welfare Pension Plan Disclosure Act, 29 U.S.C. §§ 301-09, repealed by Employee Retirement Income Security Act, Pub.L. No. 93-406, § 111, 88 Stat. 851, codified at 29 U.S.C. § 1031, and the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1381. Each fund was managed by a board of trustees comprised of three management trustees and three union trustees. Joseph Campisano was the president and Vito Cariello the secretary-treasurer of Local 945, and both were union trustees of each fund. Ernest P. Palmeri, Sr., Flen Chestnut, and Frank Smith were business representatives and employees of Local 945.
 
 
 3
 The government introduced evidence tending to show that in July, 1973, the board of trustees adopted a program of concentrating the assets of the funds into fewer and larger certificates of deposit, thereby maximizing their investment performance. The board vested authority to implement the program in Cariello. During the ensuing three years, nine area banks received more than $1,200,000 from the union in savings deposits and investments in certificates of deposit, while at the same time extending nearly three quarters of a million dollars in loans to participants in the scheme or their nominees. The banks made little or no effort to collect the loans that they had extended for fear of jeopardizing future deposits or renewals of current deposits by the local.
 
 
 4
 Under the scheme, Palmeri would contact officers of banks and indicate to them that Local 945 was interested in obtaining certificates of deposit in large face amounts from certain banks. During these conversations and with varying degrees of bluntness, Palmeri would suggest that he or persons close to him were in need of loans. The bank officers, operating on the basis of the implied quid pro quo, would grant the loan with little or no meaningful evaluation of the loan application. Soon thereafter, Cariello would contact the officer to inquire about interest rates, and a deposit check on one of the union's funds would promptly arrive bearing Cariello's signature. As the scheme progressed, recipients of the loans began to default, and several of the banks victimized by the scheme experienced severe financial difficulties. In addition, the facade of extending and receiving credit began to give way to the reality of percentage kickbacks.
 
 I.
 
 5
 Many transactions were alleged in the twenty-three count indictment and supported by the government at trial. Although we will not detail each transaction, we will summarize them.
 
 
 6
 In November, 1973, Alexander Smith, President of the State Bank of Chatham, was introduced to Palmeri. They discussed Palmeri's desire for a loan and Smith's interest in obtaining deposits from Local 945. Palmeri offered to speak to Cariello and said that union funds would probably be deposited in the bank. He also indicated that from time to time he would be sending friends into the bank for loans. Palmeri, who was not a customer of the bank, requested and received a $10,000 unsecured loan on the spot. A week later Smith received a telephone call from Cariello who had talked with Palmeri and was ready to deposit $20,000. Smith received the check in December and issued a certificate of deposit to Local 945.
 
 
 7
 In January, 1974, Palmeri obtained an additional $7,500 unsecured loan from the bank after he promised to speak to Cariello about increasing Local 945's deposits. A few days later, Cariello called requesting interest rate quotations. Smith continued to press Palmeri for additional deposits and in March, 1974, Cariello called again to say that more money would soon be available.
 
 
 8
 On March 14, Palmeri obtained a $20,000 loan for his son's business, Elton Fashions. On the next day, the bank received an additional $80,000 check from Local 945. The same month, Smith agreed to lend Palmeri $20,000 for the construction of a restaurant, but only if he came up with four qualified borrowers, each of whom would receive $5,000. The loans were consummated using Campisano, two restaurant employees, and Palmeri's son as the four borrowers. Campisano's application stated that "education" was the purpose of his loan. Campisano and Palmeri later paid off the loan in cash because of Palmeri's uneasiness about Campisano having a loan outstanding from the same bank at which the union kept its funds. Campisano later denied to the FBI and to the grand jury ever having taken out a personal loan at the State Bank of Chatham or having been asked by anyone to do so.
 
 
 9
 In April, 1974, Palmeri and two officials from other unions threatened to withdraw their union deposits from the State Bank of Chatham unless Smith adopted a one hundred percent loans-for-deposits ratio. At that point Cariello and Campisano entered the room and Cariello announced that the union could keep its money in any bank with a competitive interest rate. On the promise of still more union deposits, and with the approval of the bank's board of directors, Smith ultimately agreed to a sixty percent ratio.
 
 
 10
 Several more loan for deposit transactions followed. The bank extended another loan to Elton Fashions for $15,000, and another to a sister corporation for $15,000. At Palmeri's request, appellant Chestnut received unsecured loans for $7,000 and $4,500, Emily Bonniello received one for $20,000, and appellant Frank Smith a car loan for $3,100. Palmeri also obtained a $5,000 unsecured loan for his brother. Throughout this time, Local 945's original $100,000 CD was continuously renewed, and an additional $100,000 CD was purchased with a check drawn on the Welfare Fund.
 
 
 11
 In August, 1974, Palmeri and the same two officials from other unions met with Alexander Smith to demand a two percent kickback on their deposits. Smith acquiesced in this demand. At the next meeting, which Campisano also attended, Frank Rando, one of the other officials, threatened to cooperate with the FBI's investigation of the kickback scheme. Palmeri responded: "(I)f you like breathing you won't even think such things, let alone say them." Campisano echoed the warning: "Frank, he's not kidding. Al (Smith) doesn't know anything. You know too much." Rec. at 2.171.
 
 
 12
 Alexander Smith testified that these loans were granted because of the loans for deposits arrangement with the union. Shortly after Smith left the State Bank of Chatham in May, 1975, Local 945 and its Welfare Fund redeemed their $100,000 CDs, and withdrew their deposits from the bank.
 
 
 13
 In the spring of 1974, Rando introduced Palmeri to Robert Prodan, vice-president and chief operating officer of the Bank of Bloomfield. Rando described his own loans-for-deposits relationship with the bank and Palmeri said that he would attempt to duplicate it. Palmeri went to the bank, stated his intention to obtain deposits from the local, and applied for a $15,000 unsecured loan. Prodan granted this loan on May 31, 1974. On June 21, 1974, the bank received a $100,000 check from the Welfare Fund for the purchase of a six month CD. Although Cariello signed this check, as he did all the Welfare Fund and Severance Fund checks, he never spoke to Prodan about the deposit or its terms. A few weeks later Prodan wrote to Palmeri acknowledging receipt of the money and thanking him. Palmeri called Prodan and insisted that he destroy the letter to prevent anyone from linking him to the union deposits. In July, Palmeri received a second unsecured loan for $10,000 from the Bank of Bloomfield. Four days later, the bank received a $100,000 check from Local 945.
 
 
 14
 The relationship with the Bank of Bloomfield continued with a $20,000 unsecured loan to Chestnut, a $25,000 loan to Philip Amster for the purchase of a restaurant, two $25,000 loans to the restaurant, the first of which Palmeri and George Franconero used to buy out Amster, a $20,000 loan to Emily Bonniello and Palmeri's Hotel and Tavern, an installment loan of $5,000 to Palmeri's brother, three unsecured loans totalling $25,000 to Palmeri, a loan for $125,000 to the restaurant in behalf of Palmeri, Campisano, and Franconero, and two unsecured loans totalling $12,500 to appellant Frank Smith. Palmeri also used his influence and the incentive of union deposits to obtain loans for several other persons. Throughout this time, the two certificates of deposit, one drawn on the Welfare Fund and one from the local's general funds, were continuously renewed, and an additional $100,000 deposit from the Welfare Fund was made in June of 1975.
 
 
 15
 In August, 1975, Frank Smith met with Prodan's assistant in charge of delinquent loans at the Bloomfield Bank. The bank had requested that three past due loans, one each to Palmeri, Smith, and Chestnut, be renewed and that the interest and some amount of principal be paid. Smith brought in three signed renewal notes and paid the interest up to date on the three loans. When asked if he was prepared to pay some of the principal on the three loans, one of which was his own, Smith replied that he "didn't know anything about it, that Mr. Palmeri took care of it." Smith later denied to the FBI that he knew anyone other than himself who had loans at the Bank of Bloomfield.[1]
 
 
 16
 In 1973 Palmeri was introduced to Paul Sheridan of the National Newark and Essex Bank as a man who could direct deposits to the bank. Palmeri promised to help direct union deposits to the bank and also requested and received a $10,000 unsecured loan. Palmeri later received an unsecured loan for $5,000 from the bank. In October, 1973, at Palmeri's request, Sheridan granted a $5,000 loan to Anthony LoParto. On the same day, Cariello drew a $100,000 check on the Welfare Fund for a certificate of deposit at the National Newark and Essex Bank. Palmeri later promised another officer of National Newark and Essex that he would obtain an additional $100,000 CD for the bank. On July 15, 1974, the $100,000 Local 945 Welfare Fund CD was renewed again, and on August 7, 1974, Palmeri received another $10,000 loan. The CD was renewed repeatedly thereafter until mid-1977.
 
 
 17
 During the summer of 1973 Carl Berger, President of the Anthony Wayne Bank, met with a group including Campisano and Palmeri at Local 945, to solicit deposits and indicate his willingness to offer loans to union employees. On September 18, 1973, the bank issued a $20,000 CD to the Local 945 Severance Fund in exchange for its check dated September 11. On October 17, 1973, Berger granted a $5,000 unsecured loan to Palmeri. The loan application that Palmeri had completed and signed showed no outstanding loans even though Palmeri had $15,000 in loans outstanding from the National Newark and Essex Bank. Later that month, Palmeri received a $3,600 auto loan. When Palmeri went to the bank in August, 1974, to make a payment on his loans, he told the bank officer that he could assist in directing union funds to the bank.
 
 
 18
 Berger later met twice with various characters in this drama to seek additional deposits from the local. At both meetings, he received assurances that the local would try to work it out. At the second meeting, Campisano called Cariello in and suggested that he give the Anthony Wayne Bank some additional business. In November, 1975, in response to a request by Palmeri, the bank granted Chestnut a $2,705 car loan. Over the opposition of a junior officer, the bank later granted an $8,000 loan to Palmeri, who had refused to submit a financial statement.
 
 
 19
 In July, 1974, Cariello called the President of the Totowa Savings and Loan Association and asked for a loan in behalf of an unidentified employee. Cariello picked up a blank mortgage application from the bank and a few days later Chestnut, who was seeking the loan, returned it. The bank approved a $46,900 mortgage to Chestnut, whose annual salary was only $19,500. One week after Chestnut's mortgage was approved, the bank received a $20,000 check for deposit drawn on Local 945 and signed by Cariello and Campisano. Two weeks later, it received a $75,000 check drawn on the Local 945 Severance Fund and co-signed by Cariello.
 
 
 20
 Palmeri was introduced to Joseph Macula, vice president of the First National Bank of Piscataway, for the purpose of obtaining a loan. At the time of the introduction Local 945 and the Local 945 Welfare Fund each had a deposit at the bank. In January, 1975, the Local 945 Welfare Fund purchased a $40,000 CD. In February, a second $40,000 CD was purchased with a Local 945 check signed by Cariello and Campisano. Each of the CDs was renewed by Cariello prior to June 25, 1975, when Palmeri was granted a $15,000 loan. In connection with the loan Palmeri submitted a financial statement showing no outstanding loans.
 
 
 21
 In January, 1975, the Local 945 Welfare Fund purchased an $80,000 CD at the American National Bank and Trust Company of New Jersey. Later that month Palmeri went to the bank seeking a $10,000 unsecured loan on the promise that he would obtain additional union funds for deposit. The loan was granted that same day. The financial statement submitted by Palmeri in connection with the loan did not accurately reflect the amount of his outstanding loans at the Bank of Bloomfield, the Anthony Wayne Bank, or the National Newark and Essex Bank. In the ensuing months the Local 945 Severance Fund purchased a $40,000 CD and the Welfare Fund added $20,000 to its deposit and acquired a $100,000 CD which was serially renewed.
 
 
 22
 In April, 1976, the Welfare Fund purchased a $100,000 CD at the Mountain Ridge State Bank, followed a month later by the Severance Fund's purchase of a $40,000 CD from the bank. In May, Palmeri's son obtained a $60,000 loan on the understanding that Palmeri would direct another $100,000 deposit to the bank. A corporation with which Palmeri's son-in-law was associated obtained a $20,000 loan at the same time. In July and December, 1976, the Local 945 Severance Fund purchased two additional CDs at the bank in the amounts of $20,000 and $40,000, thus completing the promised deposit of an additional $100,000.
 
 
 23
 In June, 1975, John Takacs asked Prodan to help the Springfield State Bank obtain a substantial deposit with which it could purchase discounted leases from Takacs' equipment leasing business. Prodan met with Palmeri and requested a deposit at Springfield State Bank. A few days later Prodan received a telephone call from Vincent Capone who told him the deposit could be arranged but only in exchange for a $1,000 kickback. Takacs sent an envelope containing $1,000 cash to Prodan, who delivered it to Capone. Cariello then issued a $100,000 check on the Local 945 Welfare Fund, Prodan delivered the check to Takacs, and he deposited it at the Springfield State Bank. The bank then issued a CD to the Welfare Fund. Cariello later complained to Prodan that the interest rate on this CD was too low. After Cariello raised the subject again, Prodan asked Palmeri to "get this guy off my back." Palmeri reassured Prodan saying, "You got a deal. Don't worry about it."
 
 
 24
 Appellants were tried before a jury pursuant to a twenty-three count indictment filed October 5, 1978. They were variously charged with soliciting and receiving loans and kickbacks in connection with their association to Local 945's employee benefit plans, with violating and conspiring to violate the federal anti-racketeering statute, and with filing false loan applications.[2] They were convicted and sentenced. On appeal, they raise several arguments. First, appellants Palmeri, Smith, and Chestnut argue that the trial court erred in allowing the case against them to go to the jury because they are not within the class of persons to which the predicate offense, 18 U.S.C. § 1954, applies. Second, all appellants object to the use of special verdict forms, alleging that these forms led the jury to reach a guilty verdict. Third, all appellants object to the introduction into evidence of transactions involving funds that are not subject to § 1954. Finally, each appellant argues that the government's case against him was insufficient as a matter of law to support a jury finding of guilt.
 
 II.
 
 25
 The predicate statute under which each of the appellants was prosecuted is 18 U.S.C. § 1954,[3] which provides in relevant part:Whoever being-
 
 
 26
 (1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan; or
 
 
 27
 (3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan;
 
 
 28
 receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money, or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan . . . shall be fined not more than $10,000 or imprisoned not more than three years, or both . . ..
 
 
 29
 As used in this section, the term (a) "any employee welfare benefit plan" or "employee pension benefit plan" means any employee welfare benefit plan or employee pension benefit plan, respectively, subject to any provision of title I of the Employee Retirement Income Security Act of 1974, and (b) "employee organization" and "administrator" as defined respectively in sections 3(4) and (3)(16) of the Employee Retirement Income Security Act of 1974.
 
 
 30
 Palmeri, Smith, and Chestnut assert that the statute is inapplicable to them because they were merely business agents of the union, and thus were not in positions exercising authority to disburse money from the funds. Thus, they did not occupy positions that the statute was intended to regulate. Indeed, they argue, the statute is explicit on this point, requiring that the prohibited actions be taken "with intent to be influenced with respect to, any of his actions, decisions or other duties relating to any question or matter concerning such plan . . .." This language, in appellants' interpretation, limits the scope of § 1954 to persons who by their direct and unassisted actions can exert influence over the benefit plans.
 
 
 31
 We read the statute differently. The first clause of § 1954 refers to anyone who is "(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan . . . ." Under this provision, these three appellants are within § 1954 because they are employees and agents of Local 945. If we read the rest of the statute as appellants ask, however, the only union employees who would be covered are those who are both employees of the union and trustees or administrators of the qualifying funds. This construction would render clause (3) redundant of clause (1), which makes the statute applicable to "(1) an administrator, officer, trustee, custodian, counsel, agent, or employee of any employee welfare benefit plan or employee pension benefit plan . . . ." We should not construe a statute to make it redundant of itself, see Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979); Jarecki v. G. D. Searle & Co., 367 U.S. 303, 307-08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961); United States v. DiSantillo, 615 F.2d 128, 135 (3d Cir. 1980), and we do not do so here.
 
 
 32
 The more reasonable construction of the statute is one that includes within the regulated class all persons who exercise control, direct or indirect, authorized or unauthorized, over the fund. This accords with the broad purpose of the anti-racketeering statute, 18 U.S.C. § 1962, for which § 1954 serves as a predicate offense. See Organized Crime Control Act of 1970, Pub.L. No. 91-452, § 904, 84 Stat. 941, codified at 18 U.S.C.A. § 1961 note (mandating liberal construction); United States v. Forsythe, 560 F.2d 1127, 1135-36 (3d Cir. 1977). It also discourages behavior, like that at issue in this case, that undermines the purposes of the act but is undertaken by persons with no official position with respect to the fund. Thus, we hold that § 1954, the predicate statute for the substantive and conspiracy convictions under § 1962(c) and (d), applies to appellants Palmeri, Smith, and Chestnut.
 
 
 33
 Appellants cite several decisions as persuasive precedent, arguing that they have reached a different result. As support for their argument that the first part of § 1954 is a mere "definitional preamble" that does not describe an offense, they cite United States v. Marroso, 250 F.Supp. 27 (E.D.Mich.1966). From this premise, they conclude that the substantive offense under § 1954, and thus the offense on which the § 1962 violations must be predicated, is described in the second part of § 1954. In further support of their contention that § 1954 applies only to persons in a fiduciary relationship to the employee benefit plan, they cite Russo v. United States, 442 F.2d 498 (2d Cir. 1971), cert. denied, 404 U.S. 1023, 92 S.Ct. 669, 30 L.Ed.2d 673 (1972).
 
 
 34
 Neither of these decisions supports appellants' position. In Marroso, the district court restricted its holding to the failure of the government to prove the allegations contained in the indictment and bill of particulars. For example, it stated that "(t)he Government by the indictment and bill of particulars is limited to proving that defendant received the payment while an agent of the Pension Fund. This it has failed to do." 250 F.Supp. at 31. Thus, Marroso is not responsive to our analysis of the statute, but instead represents a case in which the government presented an indictment drawn more narrowly than required by the statute. In Russo, the appellant argued that he was neither employed by nor an agent of the employee benefit plan. 442 F.2d at 502. The second circuit rejected this argument, however, holding that the government had established that he "render(ed) advice to the Fund on a regular basis, including giving the Fund advice regarding the financial status of potential borrowers . . . ." Id. Thus, Russo was a situation much like this one, in which the appellants had no formal relationship with the plans but exercised sufficient influence over them to come within the proscription of § 1954.[4]
 
 III.
 
 35
 The second argument for reversal, pressed most vigorously by appellant Campisano but joined also by Palmeri, Smith, and Chestnut, is that the government proved its case by reference to transactions that are not proscribed under § 1954. Specifically, appellants object to the introduction of evidence regarding deposits from general union treasury funds, which the government now concedes are not "employee benefit plans" for purposes of § 1954. Evidence of these transactions went before the jury, appellants contend, with insufficient trial court instruction to distinguish them from transactions that could prove a racketeering offense under § 1954.
 
 
 36
 The government argues that the transactions from the treasury fund were admissible as overt acts in furtherance of the conspiracy alleged under § 1962(d). We agree that evidence of the transactions was admissible to prove the conspiracy because the overt acts necessary to establish a conspiracy need not themselves be illegal. See Braverman v. United States, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942); United States v. Adamo, 534 F.2d 31, 39 n.6 (3d Cir.), cert. denied, 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). The more troublesome argument, however, is that the trial judge failed to distinguish these unprohibited transactions sufficiently from the transactions prohibited by § 1954.
 
 
 37
 We reject appellants' argument for two reasons. First, appellants now concede that they made no clear objection to the trial court's instructions relevant to this issue. As one appellant has candidly stated: "The distinction between treasury checks-the only ones signed by appellant Campisano-and covered welfare fund checks seemed to escape all of the trial participants." Post-argument Brief for Appellant Joseph Campisano at 3. An appellate court is understandably reluctant to reverse a trial court for reasons not presented to it. See Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 401 (3d Cir. 1980). Thus, appellants are reduced to arguing that the trial court's instructions were plain error resulting in a manifest denial of justice. Although we will review the arguments on this basis, we note at the outset that our scope of review under this standard is substantially circumscribed. As the Supreme Court noted in Henderson v. Kibbe, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977), "(i)t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." See Fed.R.Crim.P. 30; United States v. Pennsylvania Refuse Removal Ass'n., 357 F.2d 806, 809 (3d Cir. 1966), cert. denied, 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966).
 
 
 38
 Whenever an appellate court reviews jury instructions given by the trial court, it must begin from the premise that the instructions must be reviewed as a whole to preserve their context. Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir.), cert. denied, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977). Although at one point in its instructions on § 1954 the trial court seemed to fall into the error about which appellants are now concerned,[5] the instruction regarding § 1954 consumed fifteen pages of the trial transcript. See Rec. at 12.45 to 12.60. Reading the entire instruction as a whole, we note at least five instances in which the court emphatically distinguished the Welfare and Severance Funds as the two accounts to which § 1954 would apply. Rec. at 12.50; id.; 12.52; 12.55; 12.65 to 12.66. The court carefully cautioned the jury that it could not transfer to appellants the intent of the bankers, who may have offered loans to appellants with intent to obtain deposits from the treasury fund as well as from the Welfare and Severance Funds. By mentioning the treasury funds in this context, however, the trial judge committed no error. Not only did he properly distinguish the funds, but actually aided the appellants by assuring that the jury did not become confused about whose intent would control.
 
 
 39
 Thus, the jury instructions as a whole fail to demonstrate a manifest denial of justice. The instructions left the jury with a clear impression that only money from the Welfare and Severance Funds was relevant to the § 1954 allegations. We therefore reject this argument.[6]IV.
 
 
 40
 Appellants' next argument challenges the use of special interrogatories by the trial court. In essence, they argue that the interrogatories were inherently prejudicial and alternatively that the structure of these interrogatories predetermined the jury's verdict. We find no error in the use of special interrogatories in this complicated criminal case.
 
 
 41
 The first problem with appellants' argument is that this specific objection was not made before the trial court at an appropriate time. At the close of the evidence, the trial court conducted a hearing pursuant to Fed.R.Crim.P. 30 on pending motions and requests for specific jury instructions. At that time counsel for appellants moved to withhold the indictment from the jury during its deliberations in light of the trial court's announced intention to require special interrogatories.[7] After the jury was charged, the parties merely renewed their objections from the prior hearing. The objection to the special interrogatories was not raised in post-trial motions for a new trial, most of which in this case dealt with allegations that the government had produced insufficient evidence to sustain the convictions. Thus, the objection regarding the special interrogatories is not properly before us on this appeal.[8]
 
 
 42
 Even if it were before us, however, we would hold that the trial judge committed no reversible error. Although special interrogatories are disfavored in criminal trials, see United States v. Frezzo Brothers, Inc., 602 F.2d 1123, 1129 (3d Cir. 1979), cert. denied, --- U.S. ---, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), this court has established no per se rule against them. Indeed, in the first circuit decision on which appellants principally rely, the court recognized a substantial body of criminal cases in which special interrogatories have been used to protect defendants. See United States v. Spock, 416 F.2d 165, 182 n.41 (1st Cir. 1969).[9] In this case, five defendants were tried on a twenty-three count indictment alleging forty-six acts of racketeering and numerous other violations of federal law. We think special interrogatories were properly employed to decrease the likelihood of juror confusion and to aid the jury in concentrating on each specific defendant, and the charges against him, rather than incriminating one potentially innocent defendant solely on the basis of his association with the others. In addition, the disfavor with which courts view special interrogatories in criminal cases results from interrogatories that lead the jury in a step-by-step progression to a verdict of guilty. See, e. g., Frezzo Brothers, 602 F.2d at 1129; Spock, 416 F.2d at 182. This concern does not arise in this case.
 
 
 43
 The primary objection raised by appellants is to the special interrogatory relevant to the racketeering allegations in count two of the indictment. The interrogatory was in the form of a chart listing each defendant across the top and numbered through forty-six on the left side for each allegation of racketeering. A blank space was provided for each defendant to whom the racketeering acts related. Across the top of the form was printed:
 
 
 44
 In reaching a verdict on count 2, you must first decide whether or not each defendant committed two or more acts of racketeering. Forty-six acts of racketeering are alleged in the indictment. A space is provided alongside the number corresponding to each act of racketeering alleged in count 2 for you to record your verdict as to each defendant charged with committing that act. If your verdict is guilty, write "G" in the appropriate space; if not guilty, write "NG."
 
 
 45
 App. at 72a. That the jury understood the form and was aided by it is demonstrated by their acquittal of Palmeri and Cariello on acts twenty-seven and thirty-nine, and Smith on act thirty-two.
 
 
 46
 We conclude that the verdict form did not compel the jury to convict the appellants by constructing a chain of findings leading to inevitable conviction. In fact, the jury had to make a full determination of involvement in the acts of racketeering with respect to each defendant. They were fully instructed on the law relevant to this determination. We fail to see how the chart prejudiced the defendants, especially since the second chart required the jury to reach and enter a verdict with respect to each count in the indictment. The jury obviously could look at the first chart and note whether or not they had found any defendant guilty of two counts of racketeering, and then enter the appropriate verdict in the blank provided beside count two. But in a case as complex as this one, we would anticipate the jury to note its prior determinations, even absent special interrogatories, and refer to these notations when reaching a verdict on the racketeering counts. Even if the jury did not use notes, we see no difference between using notes or interrogatories and merely making the determinations on the acts of racketeering and then applying the standards for conviction under § 1962(c), the most crucial of which is that the defendant have committed two or more acts of racketeering. We hold, therefore, that, in the circumstances of this case, the trial court did not err in giving the jury special interrogatories to aid it in its deliberations.
 
 V.
 
 47
 The final argument presented by each appellant is that the government presented insufficient evidence to support the jury verdicts of conviction. Our standard of review in examining a claim for insufficient evidence to support a jury verdict is whether "there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision." Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1013 (1978); see also United States v. Pearlstein, 576 F.2d 531, 534 (3d Cir. 1978). Although the government must establish at least two acts of racketeering to prove a "pattern of racketeering activity" in violation of the statute, see 18 U.S.C. § 1962(c); United States v. Frumento, 409 F.Supp. 136, 139 (E.D.Pa.1976), aff'd, 563 F.2d 1083 (3d Cir. 1977), cert. denied sub nom. Millhouse v. United States, 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978), it may link a particular defendant to that pattern by producing evidence that shows his knowledge and participation in the scheme. In this case the government did establish an ongoing pattern of racketeering activity. To obtain convictions, it also had to prove that each defendant was voluntarily connected to that pattern and performed at least two acts in furtherance of it. See United States v. Elliott, 571 F.2d 880, 898-99 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The transactions proved in this case are not illegal by their objective appearance, but become illegal because of the actors' intent. Thus, the evidence necessary to connect the appellants to this scheme is largely composed of circumstantial evidence of their motivations. We conclude that the government presented evidence sufficient to demonstrate repeated participation by every appellant but Chestnut in the pattern of illegal activity.
 
 A.
 
 48
 Although appellant Palmeri places one of his arguments under the rubric of insufficient evidence to sustain his conviction, his argument is actually that § 1954, the predicate statute, does not apply to him. For the reasons noted above, we have concluded that § 1954 does proscribe abuse of employee benefit plan assets by persons who do not hold a formal position with respect to those plans but who nonetheless exercise real influence over the distribution or investment of their assets. Palmeri does not seriously contend that the evidence connecting him to at least two acts of racketeering and to the conspiracy to engage in the scheme was insufficient to support the jury's verdict. The government's case against him, which might best be characterized as overwhelming, painted him as the hub around whom the entire scheme turned. We will therefore affirm the jury's verdict and the court's sentence against Palmeri.
 
 B.
 
 49
 The primary argument raised by Campisano is that the evidence of his participation in transactions proscribed by § 1954 was insufficient to support his conviction. His principal contention is that he was authorized to sign only checks from general funds, not from the employee benefit plans to which § 1954 applies, and that the admission of checks bearing his signature and drawn on the treasury of Local 945 operated substantially to his prejudice. We have previously rejected the argument that the trial court erred in admitting evidence of the treasury fund transactions. We must now determine if the evidence relating Campisano to the conspiracy and to two discrete acts of racketeering was sufficient to allow a reasonable jury to convict him.
 
 
 50
 The government's case against Campisano included evidence from which a reasonable jury could conclude that Campisano acted with Palmeri in extracting loans from the State Bank of Chatham. Although Campisano could not sign checks issued from the Welfare or Severance Funds, the appearance of his signature on a check drawn on Local 945's general fund, Rec. at 1.194 to 1.195, and his receipt of a loan from the Bank, id. at 2.41 to 2.43, indicate his awareness of the scheme to extract loans for deposits. Because the Welfare Fund made a $100,000 deposit at the bank in August of 1974, the entire pattern of loans for deposits came within § 1954. Id. at 2.133. Campisano was also present when Palmeri threatened to kill Rando if he disclosed the scheme to the FBI, and even assured Rando of the credibility of Palmeri's threat. Id. at 2.171.
 
 
 51
 Similarly, after the Bank of Bloomfield had received a $100,000 check from the Welfare Fund, Campisano joined Palmeri in asking Prodan to grant a loan to Chestnut. Rec. at 4.96 to 4.102. Campisano also had an interest in the restaurant that benefitted from several loans from the Bank of Bloomfield. 4.186 to 4.189. He was present at a meeting with Palmeri and the President of the Anthony Wayne Bank, during which he instructed Cariello to give the bank some additional business. Id. at 7.219. Each of these incidents was supported by sufficient evidence from which the jury could conclude that Campisano was a willing participant in the conspiracy and committed these acts in violation of § 1954. We conclude, therefore, that Campisano's conviction and sentence will be affirmed.
 
 C.
 
 52
 Appellant Frank Smith presents a somewhat closer case than Campisano or Palmeri. The prosecution's evidence tended to show that Smith received a $3,100 automobile loan from the State Bank of Chatham, id. at 3.114, a $2,500 unsecured loan from the Bank of Bloomfield, id. at 4.168 to 4.170, and a $10,000 unsecured loan from the Bank of Bloomfield, id. at 4.180 to 4.182, each of which occurred during times of deposit activity from the Welfare and Severance Funds. Although this evidence alone would be insufficient to sustain Smith's conviction, he deposited the proceeds of the $10,000 loan into Palmeri's account the day he received the loan. Id. at 4.180 to 4.182, 7.40 to 7.41. In addition, when he entered the Bank of Bloomfield to make payments on three outstanding loans, one of which was in his name, he stated that he "didn't know anything about it, (and) that Mr. Palmeri took care of it." Id. at 7.41 to 7.42, 7.67 to 7.68. From these incidents, the jury could conclude that Smith was knowingly participating in the conspiracy. By accepting three loans pursuant to the scheme, he committed the requisite acts of racketeering for purposes of § 1962(c). His conviction will therefore be affirmed.
 
 D.
 
 53
 Unlike Campisano and the other defendants, Cariello received no personal loans under the scheme. Nevertheless, the evidence presented by the government concerning Cariello's contacts with Totowa Savings and Loan Association regarding a mortgage loan to Chestnut was sufficient for a reasonable jury to infer Cariello's knowledge of and participation in the scheme. Cariello telephoned the bank, asked for a loan application for an employee of the union for whom he wanted to obtain a mortgage, picked up the application, and Chestnut returned it a week later. Id. at 8.204 to 8.206, 8.214 to 8.215. The bank subsequently approved a $46,900 mortgage for appellant Chestnut, whose annual salary was only $19,500. Id. at 8.214 to 8.215. Eight days after Totowa approved the Chestnut mortgage, it received a check for deposit drawn on Local 945 and signed by Cariello and appellant Campisano. Id. at 8.218 to 8.220. Two months later, it received another deposit check for $75,000, signed by Cariello and drawn on the Local 945 Severance Fund. Id. Having established his knowledge of the scheme, the government's proof that Cariello's signature appeared on each of the deposit checks, if believed, could support an inference of his intimate involvement.
 
 
 54
 Cariello attempts to negate this inference by arguing that he was charged by the board of trustees with the placement of the Funds' assets, and that he was influenced only by prevailing interest rates in determining where to purchase certificates of deposit. In light of the evidence of a link between Cariello and the scheme, we need only note that the jury listened to this argument and rejected it. Further refutation of Cariello's assertion that he relied solely on interest rates in placing the funds comes from testimony recounting statements by Cariello to Robert Prodan, vice-president of the Bank of Bloomfield, who was implicated as the intermediary for several of the illegal transactions. Cariello indicated his concern that certain deposits at the Springfield State Bank were drawing inadequate interest. Id. at 5.55. Prodan in turn asked Palmeri to "get this guy (Cariello) off my back," and Palmeri assured him, "You got a deal. Don't worry about it." Id. at 5.56. A jury could reasonably infer, taking this evidence together with the evidence previously mentioned, that Cariello was not actually placing the money with the institution offering the highest interest rate, but instead was participating in the kickback scheme. His concern about the low rates could merely indicate a concern that money for which he was most directly responsible was being too obviously misused, thus subjecting him, more than other participants in the scheme, to criminal investigation. All this evidence, taken together and in the light most favorable to the government, supports Cariello's conviction under §§ 1962(c) and 1954. This evidence is also sufficient to support an inference of Cariello's participation in a kickback conspiracy in violation of § 1962(d).
 
 E.
 
 55
 Appellant Chestnut seems to have been a major beneficiary of the loans for deposits scheme. The government introduced evidence at trial tending to prove that Chestnut received over $80,000 in loans, a large part of which were unsecured, from four different banks. During the relevant time, Chestnut was a business agent for the union with an annual salary of $19,500. Id. at 8.214 to 8.215. The prosecution's evidence indicated that Chestnut knew he would be unable to repay the loans when he obtained them, id. 4.11 to 4.15, that he had obtained them not on the basis of his financial ability but because of his position with the union, id. at 4.23 to 4.24, and that he failed to disclose prior loans when he applied for additional loans, id. at 4.103 to 4.104, 7.200 to 7.201. Chestnut obtained one unsecured loan from the State Bank of Chatham immediately after appellant Palmeri introduced him to Alexander Smith, president of the bank. Id. at 2.88 to 2.92. But at this point the government's case against Chestnut stops. It submitted no evidence tending to prove Chestnut's knowledge or participation in the scheme. That he benefitted from the loans for deposits plan is clear; what is unclear is his knowing participation in it. He cannot be held liable if, for instance, he received the loans merely because the principals in the scheme liked him or thought he needed money. Only if he knew the true basis for the loans, and participated in the plan, has he run afoul of § 1954 and thus § 1962. The government simply failed to provide that connection. Accordingly, Chestnut's conviction will be reversed on both the substantive and conspiracy counts.
 
 VI.
 
 56
 Accordingly, the verdicts against Palmeri in No. 79-2147, Campisano in No. 79-2148, Cariello in No. 79-2149, and Smith in No. 79-2150, will be affirmed. The conviction of Chestnut in No. 79-2424 will be reversed.
 
 
 
 *
 Honorable John B. Hannum, of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 In November, 1975, Prodan was asked to resign by the Board of Directors of the bank. In January, 1976, the Federal Deposit Insurance Corporation closed the bank. The loans from the Bank of Bloomfield set forth in the indictment totalled.$399,500. As of April, 1979, the outstanding balance on those loans was $388,314.18, plus interest
 
 
 [2]
 We have considered Palmeri's argument that his conviction for filing false loan applications in violation of 18 U.S.C. § 1014 is barred by the double jeopardy clause, and find it without merit
 
 
 [3]
 Section 1954 serves not only as a substantive offense, but also serves as a predicate offense for 18 U.S.C. §§ 1962(c) and (d), which provide:
 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.
 To establish a violation of § 1954, the government must prove that the defendant served in one of the positions specified in the first part of the statute, and that he solicited or received certain benefits with intent to be influenced in his dealings with the employee benefit plan. Section 1954 was the subject of counts 3-15 of the indictment. If two or more violations of § 1954 are established, the defendant becomes subject to § 1962(c), which requires that these two "acts of racketeering" be related to the conduct of the enterprise. See United States v. Elliott, 571 F.2d 880, 899 n.23 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Section 1962(c) was the subject of count two of the indictment. Subsection (d) of § 1962 proscribes conspiracies to violate subsection (c), and was the subject of count one of the indictment.
 
 
 [4]
 Appellants also rely on United States v. Porter, 591 F.2d 1048 (5th Cir. 1979), a prosecution under 42 U.S.C. § 1395nn(b)(1) for receiving kickbacks in connection with federal medical care programs. We do not find the analogy to this case sufficient to refute our previous analysis of § 1954
 
 
 [5]
 The court stated:
 In order to convict a defendant, you must find that he directly or indirectly received or agreed to receive or solicited a kickback, loan, money or thing of value because of or with the intent to be influenced with respect to his actions, decisions, or other duties concerning the placing of deposits of the funds of Local 945 or its Welfare or Severance Funds.
 Rec. at 12.51 to 12.52.
 
 
 [6]
 Appellant Campisano also notes that Count 1, paragraph 3 of the indictment included use of "the assets of Local 945" as "part of said conspiracy . . . ." Because abuse of the treasury assets is not in itself a crime, appellant argues that the trial court should have stricken paragraph 3 from the indictment. This argument necessarily equates the phrase "part of the conspiracy" with "object of the conspiracy." Although the object of a conspiracy must be illegal, "part of the conspiracy" is better interpreted in this context as a reference to the overt acts taken in furtherance of the conspiracy. This interpretation is confirmed by the trial court's instruction on the conspiracy counts. Rec. at 12.34 to 12.35
 
 
 [7]
 Edward N. Fitzpatrick, Esquire, counsel to appellant Cariello, specifically moved that the indictment not be sent out with the jury:
 I would urge the court that the indictment with its charts and its (schedules) essentially performs the same function that we objected to heretofore, that is that it provides a summation by virtue of a charge for the government. . . . I would not have an objection . . . if that chart could be excised. If it cannot be excised, then I would ask the court to exercise its discretion in as much as your honor has already indicated that you are going to have a jury form which will give them a score card, which is one of the essential purposes of having them take the indictment with them into the jury room.
 Rec. at vol. 10, pt. 2, pp. 46-47. Other defense counsel joined the motion, id. at 47-48, which was ultimately denied, id. at 12.80.
 
 
 [8]
 Because special interrogatories are rarely used in criminal trials, we must draw on our experience with them in civil trials. In civil trials, failure to present a timely objection to the specific wording of the interrogatories results in waiver. Frankel v. Burke's Excavating, Inc., 397 F.2d 167, 170 (3d Cir. 1968). It is not unfair, therefore, to require a criminal defendant to object, at least generally, to their use. Decisions examining jury instructions in criminal trials, a similar problem to interrogatories, also emphasize the need to make a timely objection. Henderson v. Kibbe, 431 U.S. at 154, 97 S.Ct. at 1736; United States v. Pennsylvania Refuse Removal Ass'n., 357 F.2d at 809
 
 
 [9]
 The court divided these cases into two classes: those in which a specific finding was necessary under the statute for sentencing, and those involving allegations of treason, in which the United States Constitution, art. III, § 3, specifically requires an overt act