UNITED STATES of America, Appellee,

v.

**Manuel Antonio OGANDO, Anastasio Pineda Ogando, also known as Anibal, also known as Matuti; and Bienvenido Castillo, Defendants–Appellants.**

Nos. 1278–80, Dockets 91–1673, 91–1674 and 91–1708.

United States Court of Appeals, Second Circuit.

Argued March 30, 1992.

Decided May 29, 1992.

Susan G. Kellman, New York City, for defendant-appellant Manuel Antonio Ogando.

Wesley M. Serra, Bronx, N.Y. (Brown, Berne & Serra, Bronx, N.Y., of counsel), for defendant-appellant Anastasio Pineda Ogando.

Philip R. Edelbaum, New York City, for defendant-appellant Bienvenido Castillo.

Brian Douglas Coad, Asst. U.S. Atty., New York City (Otto G. Obermaier, U.S. Atty., Charles G. Labella, Guy Petrillo, Linda C. Severin, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before: MINER and McLAUGHLIN, Circuit Judges, and AMON, District Judge.*

McLAUGHLIN, Circuit Judge:

Manuel Ogando ("Manuel"), Anastasio Ogando ("Anastasio") and Bienvenido Castillo were convicted in the District Court for the Southern District of New York (Pierre N. Leval, *District Judge*) of conspiracy to distribute and possess with intent to distribute over five kilograms of cocaine, in violation of 21 U.S.C. § 846 (1988), and of using and carrying firearms in relation to drug trafficking crimes, in violation of 18 U.S.C. § 924(c) (1988). Manuel and Anastasio were also convicted of operating a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(a) (1988). On appeal, the defendants make several challenges to their convictions and sentences. We now affirm in all respects and write only to address the submission of special interrogatories to juries in CCE cases.

* Honorable Carol Bagley Amon of the United States District Court for the Eastern District of New York, sitting by designation.

## BACKGROUND

The proof established that the Ogandos operated a significant cocaine trafficking business in Manhattan for ten months in 1988. They employed at least eleven confederates and operated around the clock. Emulating legitimate businesses, the Ogandos employed several shifts of workers so the business was capable of serving its customers any hour of any day. Of course, cocaine trafficking is dangerous work, particularly for an operation like the Ogandos' which always had cash and drugs on hand. Accordingly, the Ogandos armed their employees and armed them well.

The Ogando operation did not go unnoticed by the New York Police Department. In January 1988, an undercover police officer purchased a total of four grams of cocaine from the Ogando group on two separate occasions. After the second purchase, the police arrested Anastasio and three other workers, seizing two bags of cocaine, 22 vials of crack and over $1,000 cash. Anastasio, using an alias, pleaded guilty in New York State Court to attempted criminal sale of cocaine but he soon rejoined the business.

Several months later, New York City police began surveilling the Ogando cocaine business again. On October 11, 1988, undercover officer Christopher Hoban, accompanied by his partner Michael Jermyn, purchased cocaine from the Ogando operation, then located in an apartment in upper Manhattan. The two returned to the same apartment one week later to purchase more cocaine. As officer Hoban counted out the money for the cocaine purchase, defendant Castillo, who had worked for the Ogandos for at least two months, placed cocaine on a scale. Castillo ordered officers Hoban and Jermyn to sample the cocaine. When they both declined, one of Castillo's co-workers shouted "Policia, Policia!" Castillo held a

gun to officer Hoban's head as another worker searched the two officers. When the search produced officer Jermyn's service revolver, a struggle broke out. Castillo shot officer Hoban twice from close range, killing him. Officer Jermyn managed to escape unscathed; but so did Castillo.

Castillo, aided by Manuel, evaded the police and fled to Puerto Rico. Arrested nine days later, he was extradited to New York for trial. He was then convicted in state court on December 1, 1989 of murdering officer Hoban.

In August 1990, all three defendants were indicted in the Southern District for conspiracy to distribute and possess with intent to distribute over five kilograms of cocaine, in violation of 21 U.S.C. § 846 (1988), and for carrying firearms during drug trafficking crimes in violation of 18 U.S.C. § 924(c) (1988). Manuel and Anastasio were also charged with operating a CCE in violation of 21 U.S.C. § 848(a) (1988).

At trial, the Government called twenty-five witnesses, including the Ogandos' former customers and employees, as well as police officers involved in the investigation of the Ogando cocaine operation. The government also introduced over 150 exhibits, including narcotics, drug paraphernalia, weapons and scores of photographs depicting numerous Ogando workers with guns, drugs and drug paraphernalia. Finally, the Government introduced a ledger seized from Castillo chronicling two months of daily narcotics activities in the Ogando organization.

Before Judge Leval charged the jury, the Ogandos requested that he submit special interrogatories to the jury concerning the "supervised persons" and "series offenses" elements of the CCE charge. *See* 21 U.S.C. § 848(c) (1988).[1] The defense specifically

---

1. Section 848(c) provides that

a person is engaged in a continuing criminal enterprise if—
    (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations [series offenses] of this subchapter or subchapter II of this chapter—
    (A) which are undertaken by such person in concert with five or more other persons [supervisees] with respect to whom such person occupies a position of organizer, a super-

requested that Judge Leval submit so-called "blank-line" interrogatories that would require the jury to identify on a blank form (1) the series offenses it determined that each defendant committed, and (2) persons the jury found to be supervisees of each defendant.

Although he was perfectly willing to submit special interrogatories to the jury, Judge Leval concluded that the case was too complex to give the jury blank form interrogatories without accompanying instructions as to who or what could be inserted as answers. He suggested, therefore, that the defendants choose between two alternative multiple-choice formats. Under the first alternative, the interrogatories would list alleged supervisees and series offenses and the jury would be required to indicate which supervised persons and which alleged offenses on the lists the jury had found to have been proven. The second alternative would have actually used blank-line interrogatories but the jury would be furnished with a Government summation chart outlining the Government's allegations regarding supervisees and series offenses. Judge Leval informed counsel that, under either of these two procedures—and the choice was theirs—he would instruct the jury that the lists of alleged supervisees and series offenses merely reflected the Government's allegations and were not themselves evidence.

Adopting a dog in the manger tactic, the Ogandos rejected both multiple-choice formats and insisted that blank-line interrogatories be used without any external aids. Judge Leval, concerned that such interrogatories would "requir[e] the jury to perform superhuman acts of memory," refused to submit them to the jury. Accordingly, the Ogandos withdrew their request for special interrogatories and Judge Leval submitted a general verdict form to the jury.

The jury returned a general verdict convicting the defendants on all counts. Judge Leval sentenced each defendant to over thirty-five years imprisonment. We now affirm the convictions and sentences in all respects.

## DISCUSSION

To convict a defendant of engaging in a CCE, the Government must establish "(1) that he committed a Title 21 drug felony violation, (2) that is part of a continuing series of Title 21 drug violations, (3) which are undertaken by such person in concert with five or more other persons, (4) with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (5) from which such person obtains substantial income or resources." *United States v. Aiello,* 864 F.2d 257, 263–64 (2d Cir.1988); *see* 21 U.S.C. § 848(c) (1988). The second element listed above is the so-called "series offenses" requirement while the third and fourth elements constitute the statute's "supervised persons" requirement.

These five specific requisites demonstrate that the CCE statute, like its cousin RICO, is designed to punish and eradicate substantial criminal ventures. *See Garrett v. United States,* 471 U.S. 773, 784–85, 105 S.Ct. 2407, 2414–15, 85 L.Ed.2d 764 (1985) (discussing legislative history of CCE statute). Thus, CCE trials often present the same complexities for judge and jury as RICO cases, particularly with respect to proving the requisite series offenses and supervisees. In this case, for example, the Government introduced evidence that the Ogandos operated a substantial cocaine trafficking business over ten months from three different locations with at least eleven workers making round-the-clock cocaine sales.

These complexities have prompted us to conclude that, notwithstanding the law's "traditional distaste for special interrogatories," *United States v. Coonan,* 839 F.2d 886, 891 (2d Cir.1988), "where the offense charged required proof of a specific number of predicate facts and the nature of the proof at trial warrants it, the trial court

---

visory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

would be well advised to submit to the jury interrogatories that would allow an assessment of whether the jury's determination of guilt rested on permissible bases." *United States v. Roman*, 870 F.2d 65, 73 (2d Cir.) (CCE case), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3164, 104 L.Ed.2d 1026 (1989); *see also United States v. Ruggiero*, 726 F.2d 913, 922–23 (2d Cir.) (RICO case), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984).

Despite our stated preference for special interrogatories in particularly complex criminal cases, we have declined to delineate bright-line rules for determining when such interrogatories should be employed or in what form. Nor have we promulgated a checklist of criteria that district courts are bound to consider. Rather, we commit the decision of whether and how to utilize special interrogatories in such cases to the broad discretion of the district court. *See United States v. Aiello*, 900 F.2d 528, 534 (2d Cir.1990); *Ruggiero*, 726 F.2d at 927–28 (Newman, J., concurring in relevant part and dissenting in part); *see also* Note, *Bifurcated Jury Deliberations in Criminal RICO Trials*, 57 Fordham L.Rev. 745, 754 (1989) ("ultimate decision whether to use special interrogatories in criminal RICO cases is left to the discretion of the trial judge"); *cf. United States v. Previte*, 648 F.2d 73, 84 (1st Cir.1981) ("choice of procedures to be used in instructing a jury is committed in the first instance to the sound discretion of the trial judge").

Under the circumstances of this case, Judge Leval was well within his discretion in denying the Ogandos' take it or leave it demand that he submit blank-line interrogatories to the jury. The jury heard twenty-five Government witnesses and viewed scores of exhibits over six weeks of trial during which the jurors, pursuant to defendants' request, were not entitled to take notes. Furthermore, as Judge Leval noted, "nobody said to the jury during the evidence: 'This is an alleged series act.' They merely heard narratives of things that happened."

We agree with Judge Leval that requiring the jury to specify, as to each defendant, the series offenses and supervisees proved by the Government would demand of the jurors a recall of Homeric proportions. *See United States v. Cataldo*, No. 84–809, 1990 WL 134896, at *2 (S.D.N.Y. Sept. 11, 1990) ("Interrogatories of the specificity suggested by [defendants] would unduly confuse the jury and further complicate an already complex RICO trial.")

Judge Leval's suggestion that the Ogandos choose between two multiple-choice formats for interrogatories was balanced, fair and consistent with prior precedent. *See, e.g., United States v. Casamento*, 887 F.2d 1141, 1151 & 1158 (2d Cir.1989) (affirming in relevant part Judge Leval's submission to the jury of special interrogatories and government summation charts in complex RICO case), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990); *United States v. Pungitore*, 910 F.2d 1084, 1136 & n. 74 (3d Cir.1990) (listing predicate offenses), *cert. denied*, —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 98 (1991); *United States v. Palmeri*, 630 F.2d 192, 203 (3d Cir.1980) (same), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981). Because defendants may not demand special interrogatories as of right, *see, e.g., United States v. Shelton*, 588 F.2d 1242, 1251 (9th Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979); *United States v. Munz*, 542 F.2d 1382, 1388–89 (10th Cir.1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 555 (1977); *United States v. Jackson*, 542 F.2d 403, 412 (7th Cir.1976), let alone demand a specific form of special interrogatory, we hold that Judge Leval's rejection of the Ogandos' proffered interrogatories was proper, as were his proposed alternative formats for submitting special interrogatories to the jury.

We have considered the defendants' other arguments and find them to be without merit.

## CONCLUSION

Accordingly, the judgments of the district court are affirmed.